[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Plaintiff Robert McCarthy and the defendant Peter Spakowski entered into a contractual leasing arrangement for premises in which a restaurant operated in May, 1994. Spakowski, the owner of the premises, leased them to McCarthy for a three year period which by its terms would expire on April 14, 1997. The lease contained two five year renewal options, as well as an option to purchase the premises.
By certified letter dated January 5, 1996, McCarthy exercised the option. The applicable paragraph of the lease, paragraph 45, provided in relevant part that in the event the tenant chose to exercise the option, both sides would retain an appraiser, and the purchase price would be the average of the two appraisals. McCarthy obtained an appraisal almost immediately[1], but was met with delay from the Spakowski side of the transaction, for a variety of reasons. At first, Spakowski did not pick up his certified mail and he apparently traveled extensively as well. Despite reminders from the plaintiff and his attorney, who also suggested that the difference between the rental payments of $4500 per month and the anticipated payments under the refinancing plan would be significantly in McCarthy's favor, Spakowski did not forward his appraisal until September 17, 1996. As it turned out, the Plaintiff's appraisal found a fair market value of $285,000 and the defendant's fair market value was $300,000; the purchase price, then, was fixed at $292,500.
The closing was further delayed, at least in part because of the time in took for the plaintiff's financing to be arranged. During the autumn of 1996 a dispute arose as to the equipment in CT Page 12806 the restaurant. According to the lease, an itemized list of equipment "came with" the premises for the first three year term of the lease. If the first five year option to renew were to be exercised, the tenant was obligated to purchase the equipment for $100,000.00; some of the terms were further spelled out in paragraph 46 of the lease. Spakowski, however, was under the impression that McCarthy was obligated to purchase the equipment once the option to purchase was exercised.[2] In order to obviate the difficulty, there was some negotiating as to the price that McCarthy might pay for the equipment regardless of any lease provision.
On January 15, 1997, Fleet Bank, in conjunction with the Small Business Administration, committed to a mortgage in the amount of $235,000 at a 9.23% interest rate. Other fees were to be payable at the closing. On January 31, 1997, the plaintiff's attorney wrote to the defendant's attorney to report the financing commitment and to suggest a closing date of February 28, 1997; again, the attorney suggested that McCarthy was losing money every month by paying more in rent than he would be paying through his own financing.
The closing was finally scheduled for April 24, 1997. Because some differences remained between the parties, a meeting was held on April 15, 1997. It was generally agreed that three issues were outstanding at that time: there was some dispute as to whether a hood system over the stove was properly a fixture which would remain with the premises or whether it was personalty belonging to Spakowski; the removal of and/or payment for the equipment listed in the lease was still at issue; and Spakowski was uncomfortable with McCarthy's stated intention to try to resolve, either through litigation or arbitration, a claim that Spakowski's delay in closing had cost him (McCarthy) substantial amounts of money. This meeting broke down entirely, however, when McCarthy produced a broken toaster, and claimed that it was representative of the equipment that had been provided by Spakowski. Spakowski claimed that the toaster was not one that had been provided by him, and, somewhat offended because of the pride he took in the property, called off the closing.
On April 18, Spakowski's attorney wrote to McCarthy's attorney to advise him not to remove the equipment and to mention the other outstanding issues. Some alternatives were discussed concerning the removal of the equipment; on April 25, 1997, McCarthy suggested that Spakowski could pick up the equipment CT Page 12807 within thirty days after the closing. Nonetheless, the property still failed to close.
In May, 1997, McCarthy disclosed to Spakowski an offer from a third party to buy the restaurant and suggested that he (McCarthy) would be further damaged if the deal did not go through. The third party transaction was predicated on McCarthy's obtaining title to the property by early June. Spakowski did not respond to the overtures at that time; in July, 1997, Spakowski's attorney proposed that the sale could be effected if McCarthy paid $55,000 for the equipment. The sale has not yet been consummated.
McCarthy instituted the instant cause of action in June, 1997. The complaint is in seven counts and claims a breach of contract in that Spakowski failed to close in a timely manner, injunctive relief, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), unjust enrichment, violation of the implicit covenant of good faith and fair dealing, a right to specific performance of the contract, and breach as it relates to the loss of opportunity to sell the restaurant to the third party. Spakowski has denied various allegations of the complaint and asserts by way of special defense that McCarthy did not perform his obligations under the contract, that there was mutual rescission of the contract, that rescission occurred only after the plaintiff repudiated the contract, that the Statute of Frauds was violated, that the plaintiff failed to mitigate damages, that the defendant was entitled to a set off because of amounts the plaintiff did not pay to the defendant, that the terms of the agreement were so imprecise that specific performance is not possible, and that there was no mutuality as to any obligation to remove fixtures.[3] The defendant also filed a counterclaim, in which he seeks amounts for rent and/or use and occupancy payments, as the plaintiff stopped paying rent in April, 1997, and seeks to have the contract reformed, to reflect an agreement as to purchase of the equipment should the option to purchase be exercised.
The dispositive issue is who breached the contract.[4]
Repudiation, or an anticipatory breach, occurs when one side is not in default of its obligations and the other announces, in words or otherwise, that it will not perform. Gilman v. Pederson,182 Conn. 582, 584 (1981); Pullman, Comley, Bradley Reeves v.Tuck-It-Away, 28 Conn. App. 460, 465 (1992). In order for the repudiation to be actionable, the non-breaching party must be in CT Page 12808 "substantial conformity with the requirements of the contract."Gilman, supra. An anticipatory breach excuses the non-breaching side from future performance of contractual obligations. Martinv. Kavenewsky, 157 Conn. 514, 518-19 (1969).
The factual scenario in Pullman, Comley, supra, is perhaps instructive. In an interpleader action, the issue was who had breached the contract. V and T had entered into a contract to sell real estate; at about the time of the closing, V, the purchaser, canceled the closing because of claimed defects in title and a misdescription of the property in the contract. The court found that the claimed defects had in fact been released and that the misdescription was not of consequence and in any event had been corrected. The court also found that V had in reality had difficulty obtaining financing, and was looking for a way out of the contract. In the context of that case, V had breached the contract, as any derelictions on the part of T were not of consequence.
The case at hand is similar in some respects to Pullman,Comley. After McCarthy exercised the option Spakowski, whether intentionally or not, delayed performance.[5] The cited obstacles for performance were not of sufficient substance to excuse nonperformance, and, in any event, McCarthy made a number of overtures to resolve the differences. As to the issue of the equipment, for example, it is clear that there simply was no provision in the lease as to what was to happen to the equipment should the option to purchase be exercised. there were, presumably, many ways to deal with the issue including, if necessary, litigation. The course of dealings suggest that Spakowski had so little interest in actually going forward with the closing that he was unwilling to deal realistically with the equipment; he was able to find something unacceptable with any of the suggestions by McCarthy, including arbitration. The court finds, then, that the defendant breached the contract by refusing to close on the property, after the plaintiff was ready, willing and able to proceed. The plaintiff's offers of performance were not conditioned on unsanctioned conditions and thus invalid. Cf.Hartford Federal Savings Loan v. Tucker, 196 Conn. 172 (1985).
Of the available remedies, the court finds that specific performance best effects the intent of the parties at the time of the formation of the contract. Specific performance is a remedy within the broad discretion of the trial court, to be determined in light of all the facts and circumstances; Natural Harmony,CT Page 12809Inc. v. Normand, 211 Conn. 145, 149 (1989); if specific performance is awarded, the court may, in some circumstances, appropriately award damages as well. Allen v. Nissley,184 Conn. 539 (1981). It is ordered then, in the exercise of equitable powers, that the closing be held no later than January 15, 1999, at the purchase price of $292,500, with the credits to be determined as previously agreed.[6]
The issue of damages is slightly more problematical. As to the period of time prior to April 24, 1997, the date of the putative closing, the plaintiff paid rent in a greater amount than his carrying costs of the new financing. However, not all of the delay was attributable to the defendant, and some delay is reasonable in any event. The plaintiff s expert has calculated preclosing damages at $17,501 for 6.5 months of delay attributable to the defendant. The court disagrees with the method of the calculation of damages: it would appear from the first page of exhibit 33, the expert's calculation, that he considered only the interest of the $235,000 loan and not the principle. In view of all the circumstances, I find reasonable damages in that regard to be three months at $2168.79 per month, per exhibit 28, the fax from Fleet Bank which reflects the terms provided by the Small Business Administration, as amended by exhibit 13. The damages to be awarded to the plaintiff for that period of time, then, are $6506.37.
The plaintiff is also awarded $3,766, which reflect his out of pocket expenses for the closing which did not take place.
The period of time from April 24, 1997, to the present raises other issues. The plaintiff has claimed lost profits from a proposed sale of the restaurant business, which sale did not happen because the plaintiff was not able to obtain title to the property. The court finds that the lost profits in that regard are entirely too speculative to be awarded as reasonably probable damages: the claimed profits depended in part on the third party obtaining financing and, of course, on the third party actually making lease payments as contemplated. The accounting also seems to overlook entirely the fact that the plaintiff has apparently operated without paying rent or use and occupancy payments for approximately a year and a half. I do not award damages to the plaintiff for the period of time from April 24, 1997, to the present. I also do not find, in the circumstances presented, that CUTPA damages are appropriate, as I do not find that the conduct of the defendant was devious, deceptive, illegal or immoral. See, CT Page 12810 e.g., Hinchliffe v. American Motors Corp., 39 Conn. Sup. 107
(1984).
The defendant's second counterclaim, seeking reformation, was withdrawn. The first counterclaim seeks damages for nonpayment of rent and/or use and occupancy. There is merit to this contention. Because the lease was terminated, both by the notice to quit and in the circumstances surrounding the option to purchase, payments for use and occupancy are appropriate rather than contractual rent. The court finds the fair rental value to be the amounts which McCarthy would have had to pay for his financing[7], or 2168.79 per month for eighteen months, for a total due on the counterclaim of $39,038.22. As the plaintiff has been awarded $10,272.37, the net amount awarded to the defendant is $28,765.85.
Both sides may submit requests for attorney's fees. The court is expressing no opinion as to whether either is a "prevailing party" pursuant 36 of the lease.
Beach, J.